IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

CHARLES RAY CRAWFORD                                                          PETITIONER

v.                                                        Cause No. 3:17-CV-105-SA-DAS

COMMISSIONER,
MISSISSIPPI DEPARTMENT OF CORRECTIONS
EARNEST LEE,
SUPERINTENDENT, MISSISSIPPI STATE PENITENTIARY              RESPONDENTS

## ORDER AND MEMORANDUM OPINION

Petitioner, Charles Ray Crawford, an inmate in the custody of the Mississippi Department

of Corrections, has filed a petition for writ of habeas corpus on his conviction of rape in the Circuit

Court of Alcorn County and his resulting forty-six-year sentence.

## INTRODUCTION

The present petition follows a long and, at times, complicated procedural history. Because

the Mississippi Supreme Court provided a clear explanation of the facts in its opinion following

the direct appeal, this court sees no reason to rewrite what already has been written. Consequently,

this Court quotes in full the facts provided by the Supreme Court.

On April 13, 1991, seventeen-year-old Kelly Roberts [Footnote 1 in the original noted the

court's use of Sue as a pseudonym] was riding around Walnut, Mississippi, with her friend Nicole

Cutberth. The girls were in Nicole's grandfather's car. The girls had been told to put fluid in the

car and had purchased what was needed. They saw Charles Ray Crawford in the Twin Oaks

parking lot and went over to ask if he would help them put fluid in the car. Crawford had his young

son with him at the time. Crawford agreed to help and told the girls to drive over to the ballpark.

They did, and Crawford met them there. While putting fluid in the car, Crawford told Kelly that

1

he needed to talk to her about something but refused to say what it was about.

Later that evening, as the girls continued to drive around, they spotted Crawford. They flashed their lights to pull him over. Kelly asked Crawford what he wanted to talk to her about. Crawford told her they needed to get out of Walnut to talk because his ex-wife Gail might find out he was talking to her and stop him from seeing his son. [Footnote 2 from the original. "Kelly is Crawford's ex-sister-law. Crawford was married to Kelly's older sister, Janet. Janet and Crawford divorced, and he remarried a woman named Gail Thompson. After having a son together, they also divorced. In April 1991, Crawford began seeing Janet again."] Crawford told them to meet him at Chalybeate Cemetery.

After finding Crawford parked at the cemetery, the girls pulled up their car beside his truck and rolled down the window. Crawford, who no longer had his son with him, told Kelly to get in the truck so they could talk. Kelly did and Crawford told her that her boyfriend had pictures of Kelly that were "pretty bad." Crawford also told her that he had gotten the pictures from her boyfriend and planned to get rid of them. Kelly told Crawford she wanted the pictures. Crawford replied that the pictures were at his house and she should tell Nicole they needed to ride to his house. Kelly and Nicole then got in Crawford's truck, and he drove them to his house.

As they drove by the school, Crawford asked the girls to "scrunch down" in the truck so no one would see them. Crawford then parked by a nearby abandoned house instead of parking at his house. When they parked, Crawford told Nicole to stay in the car and told Kelly to walk with him to his house. When Kelly and Crawford got inside the back door of the house, Crawford stopped and told Kelly to stay there so he could make sure nobody was home. Kelly saw him walking through the house. When Crawford returned, he pulled a gun and put it to Kelly's head.

Crawford told her to do what he said and not to yell and no one would get hurt.

2

He told Kelly to get on the floor. As she did, she asked why he was doing this. Crawford told her to shut up. He taped her mouth shut with duct tape. He then told her to put her hands behind her back. When she did, Crawford taped her hands together.

Crawford pulled Kelly up and led her through the kitchen into a bedroom. Crawford lay Kelly on the bed and began removing her shoes. Kelly loosened the tape on her mouth by licking it with her tongue so she could speak. Kelly told Crawford he could not touch her because she was on her period. Crawford told her he would take care of it. Crawford pulled her pants and panties off then removed her tampon. He then engaged in sexual intercourse with her.

Afterwards, Kelly asked Crawford not to hurt Nicole. Crawford told her not to move and went outside. Kelly heard a noise then heard Crawford come back inside the house. Crawford ran into the bedroom and said somebody was there. Crawford grabbed Kelly up and they ran out of the house. As they ran out, Crawford said, "What have I done? We've got to get out of here. Somebody is here."

When they got back to the truck, Kelly did not see Nicole, but she did see a hammer. Kelly asked Crawford where Nicole was, and Crawford responded that he had hit Nicole and she had run away. Crawford then looked at Kelly and said, "What have I done? Janet is going to hate me." Kelly responded by saying "please don't hurt me."

Crawford and Kelly walked back toward Crawford's house, and he untaped her. Kelly was able to pull her clothes back on as they got back to the house. Crawford then handed Kelly the gun and told her to shoot him. Kelly told him that she could not do it. Crawford then said that he needed to see Janet. Crawford asked her to go to Memphis, Tennessee with him to see Janet. Kelly agreed to go because she was worried he might hurt her or her sister if she did not.

Kelly and Crawford got back in Crawford's truck and began driving on back roads toward

Memphis. On the way, they stopped at Barry King's house and Crawford asked to borrow his car because he knew the law would be looking for him. King refused but told Crawford to go ask Jackie Brooks if he could borrow his vehicle. Crawford and Kelly drove to Brooks's house and Crawford asked Jackie to borrow his truck because he was running from the law. Brooks refused to allow him to borrow his truck but did agree to drive him to Memphis. Brooks told Crawford to park his truck behind his house. Brooks and his wife then drove Crawford and Kelly to Memphis. There, they dropped Crawford and Kelly off at Timmy Joiner's house and returned home.

Joiner, a friend of Crawford's, drove Crawford and Kelly to a nearby Budget Inn and secured a room for them. Joiner left the two of them in the room and went back to his house. Crawford asked Kelly if she was scared. When she said she was, Crawford responded that she should not be. Kelly asked to talk to Janet, and Crawford began crying and saying he was sorry. Crawford slept on the foot of Kelly's bed holding her foot so she could not get away.

The next day, Joiner picked up Crawford and Kelly and they drove to a few different convenience stores where Crawford tried to use the phone. Crawford finally told Joiner to pull over somewhere so he could think. They pulled down a little road and stopped. Crawford began saying he was going to kill himself. Joiner calmed him down, and Crawford told Joiner to take Kelly to call Janet.

Joiner and Kelly then left Crawford where he was and drove to a pay phone. Kelly talked to Janet and told her that Crawford had raped her. Janet asked to speak to Joiner again. When Joiner got off the phone with Janet, he said that he did not understand what was going on, but that Janet had told him to tell Crawford to turn himself in to the police. Kelly cried as they drove back to where they left Crawford, and Joiner told Crawford that Janet said he should turn himself in to the police.

4

Joiner then drove Crawford to a convenience store where Crawford dialed 911 and turned himself in to police. Joiner drove Kelly to meet Janet. Kelly was taken to a local hospital, and a rape kit and hair samples were taken.

Meanwhile, Deputy Greg Hopper, Chief Deputy Tommy Story, and other officers from the Tippah County Sheriff's Department responded to a call that someone had been hit in the head. They arrived at Crawford's grandparents' house and found Nicole lying on a stretcher. Nicole told the officers that Kelly needed help and that she was at Crawford's house.

The deputies then went to Crawford's house. They knocked and yelled, but no one answered the door. Deputies found no one inside the house but did find a used tampon in the bedroom, a roll of duct tape with hair on the kitchen table, and a strip of duct tape with hair inside the house. The back door was open, and the deputies saw blood on the stairs. They also saw footprints in the garden and followed them to a nearby abandoned house. Outside they found more duct tape with hair. Relatives gave the deputies a description of Crawford's truck and an all-points bulletin (APB) was sent out.

Later, deputies located Crawford's truck behind Brooks's residence. The Memphis Police Department recovered a .22 caliber R & G revolver and apprehended Crawford. The hair found on the roll of duct tape and various pieces of duct tape found in and outside of Crawford's residence were compared with known samples of Kelly's hair and Crawford's hair. Some hair on the tape matched Kelly's known hair samples and some matched Crawford's known hair samples.

Crawford was indicted by the Tippah County Grand Jury for the kidnap and rape of Kelly (cause number 5780)—the case [then before the Supreme Court.] Crawford also was separately indicted for aggravated assault of Nicole (cause number 5779). Both cases eventually were tried separately in Chickasaw County, after the trial court granted Crawford's motion for a change of

venue.

Prior to both trials, Crawford indicated that he planned to pursue an insanity defense. Crawford was thereafter evaluated and examined by multiple mental-health professionals.

On January 30, 1993, three days before the trial for the aggravated-assault charge was set to begin, Crawford was arrested for the murder of Kristy D. Ray while engaged in the crime of kidnapping, burglary of an occupied dwelling, rape, and sexual battery. The crimes occurred on January 29, 1993. Crawford ultimately was convicted of capital murder and sentenced to death. *See Crawford v. State,* 716 So.2d 1028 (Miss.1998).

On February 1, 1993, during a pretrial hearing the morning before the aggravated-assault case was set to start, the State moved for a competency evaluation under then Uniform Rule of Circuit and County Court 4.08. William Fortier, Crawford's trial counsel at the time for both the aggravated-assault case and the instant case, responded to the motion, stating:

> Your Honor, we have consented to the motion by the State for a psychiatric evaluation to determine whether Mr. Crawford is able to stand trial at this time. I think there is a serious question as to his ability to stand trial on these charges based on the acts that have come to light over the weekend; and, therefore, we agreed with the motion; and we have approved the order submitted to the court for the psychiatric evaluation.

The trial court responded, noting first for the record that it previously had ordered that Crawford be examined at the Mississippi State Hospital at Whitfield to determine his mental ability to stand trial. A report was issued by the State Hospital on December 23, 1992, concerning Crawford's mental health. Doctors there had concluded, based on psychiatric examinations they had conducted on Crawford, that Crawford was legally competent to stand trial. The trial court then ordered another psychiatric evaluation be conducted, finding that, based on the present circumstances, reasonable grounds existed to believe that Crawford might be incompetent to stand trial. The court noted for the record that it was ordering the psychiatric evaluation on the court's

6

own motion.

That same day, Fortier submitted a motion to withdraw as counsel. The trial court stayed the motion and continued all other motions and the scheduled aggravated-assault trial until another psychiatric examination of Crawford was conducted. Three days later, the trial court granted Fortier's motion to withdraw, and James Pannell was appointed as Crawford's counsel.

Meanwhile, Crawford was evaluated at the Mississippi State Hospital on February 2, 1993, by Dr. Reb McMichael and Dr. Criss Lott. A competency hearing was held on February 11, 1993, to determine Crawford's competence to stand trial in both cases. The record indicates that, prior to the hearing, both doctors briefly evaluated Crawford at the courthouse and that Pannell was present during the interview(s). During the hearing, Pannell cross-examined both doctors as to Crawford's competency to stand trial. Pannell also questioned both doctors about what medical signs he (Pannell) should be aware of while representing and preparing Crawford for trial that might indicate to him (Pannell) that Crawford is "slipping out of competency." Following the hearing, the trial court issued an order finding Crawford competent to stand trial.

Crawford stood trial for the aggravated-assault charge on May 18, 1993. The rape and kidnapping charges were brought to trial on August 3, 1993.

Prior to the aggravated-assault trial, a motion was entered on March 16, 1993, for further psychiatric evaluation of Crawford; the record does not disclose who requested the evaluation. In May 1993, Crawford through his counsel Pannell, submitted a motion for a competency evaluation in the aggravated-assault case. On the day the aggravated-assault trial began, a pretrial competency hearing was conducted, after which the trial court found Crawford competent to stand trial. Crawford was found guilty of aggravated assault in that proceeding and was sentenced to twenty years in the custody of the Mississippi Department of Corrections. No post-trial motions were

filed at that time, and no appeal was taken. See *Crawford v. State*, 787 So.2d 1236, 1238 (Miss. 2001). On March 11, 1996, Crawford filed a pro se motion for appointment of counsel, but he did not pursue that motion. *Id*. In 1998, David Bell (who was appointed co-counsel with Pannell in Crawford's capital-murder case) filed, on behalf of Crawford, a motion for judgment notwithstanding the verdict (JNOV), or, in the alternative, for a new trial. *Id*. In the motion, Bell stated that Crawford had sought new counsel, and he (Bell) was appointed. Bell requested that the motion be considered nunc pro tunc. *Id*. The trial court found the motion for a new trial was not timely and was not properly before the circuit court. *Id*. The trial court, however, at Crawford's request and over the State's objection, considered the motion for JNOV or new trial as if it had been timely filed. Id. at 1239. After hearing arguments on the motion, the trial court found no grounds which warranted granting JNOV or a new trial and denied the motion. *Id*. Crawford then appealed to [the Supreme Court], which affirmed Crawford's conviction and sentence. *Id*. at 1249.

Meanwhile, the instant case [kidnapping and raping Kelly] was brought to trial on August 3, 1993. At trial, Crawford called his mother and ex-wife Gail Thompson to testify about spells of mental illness Crawford had experienced throughout his life and about Crawford's stays in mental hospitals. Crawford also called Jackie Brooks and Brooks's wife, Tammy. Both testified that when Crawford and Kelly were with them in Brooks's truck, they appeared to be boyfriend and girlfriend and that Kelly never indicated she had been raped. Crawford also testified at trial. His testimony indicated that he had no memory of the incident. When asked if he raped Kelly, Crawford responded: "I can't honestly say that I didn't, and I can't sit here and tell you that I did. The only thing that I've got to go by is what she said. I'm not going to lie and say I didn't, and I'm not going to turn around and lie and say that I did, because I don't know."

The State then presented two rebuttal witnesses. Dr. Stanley Russell, who had been seeing

Crawford in prison while awaiting trial, testified that his diagnosis of Crawford was adjustment disorder with depressed mood and a personality disorder. Both disorders, according to Dr. Russell, were psychiatric disorders and "do not deviate [Crawford's] responsibility for behavior." Dr. McMichael, who had evaluated Crawford twice for the purpose of conducting a sanity evaluation of Crawford and determining Crawford's competency to stand trial, also testified. Dr. McMichael testified that Crawford was malingering or faking or exaggerating his memory loss. He also diagnosed Crawford with a personality disorder and noted Crawford's past struggles with cocaine abuse, alcohol abuse, and marijuana abuse. Dr. McMichael testified that "none of these diagnoses would rise to the level of something that would cause [Crawford] truly not to know what he's doing."

On August 6, 1993, Crawford's jury found him guilty of rape and not guilty of kidnapping. The trial court sentenced Crawford to forty-six years in the custody of the Mississippi Department of Corrections for the rape conviction. Crawford's trial counsel did not file any post-trial motions in the instant case, nor did he file a notice of appeal.

On September 23, 1993, Crawford was indicted by the Tippah County Grand Jury for capital murder for the killing of Kristy D. Ray. As mentioned, Bell was appointed co-counsel with Pannell in the capital-murder case. Venue changed in that case from Tippah County to the Circuit Court of Lafayette County, Mississippi. The capital-murder case went to trial on April 18, 1994. Crawford was found guilty on all counts, and Crawford was sentenced to death on April 23, 1994. Bell, Crawford's co-counsel in the capital-murder case, represented Crawford on appeal in that case. This Court affirmed Crawford's capital-murder conviction and death sentence on appeal. See *Crawford v. State*, 716 So.2d at 1053, cert. denied 525 U.S. 1021 (Nov. 30, 1998) superseded on other grounds by *Miss. Transp. Comm'n v. McLemore*, 863 So.2d 31 (Miss. 2003),

In April 1995, Crawford sent a letter to the Chickasaw County Circuit Clerk, asking when his notice of appeal was filed in the instant case. The circuit clerk responded that the record had been transferred to Tippah County, and that she had forwarded Crawford's letter to the Tippah County Circuit Clerk. In January 1996, Crawford sent a letter to Judge Kenneth Coleman, who had presided over all three cases, asking for counsel to pursue an appeal. On March 27, 1996, Judge Coleman appointed Bell to pursue Crawford's appeal in the instant case.

Bell requested the trial transcript in July 1996. In September 1998, Bell moved for JNOV or for a new trial, which Judge Coleman denied on October 13, 1998. Bell filed a notice of appeal on November 9, 1998, and designated the record on November 25, 1998. Crawford was granted leave to proceed in forma pauperis November 30, 1998. The record is silent as to why the appeal was never docketed with [the Supreme Court].

By an order entered February 2, 2002, Thomas Levidiotis was appointed by the trial court in place of Bell. Levidiotis made inquiry with [the Supreme Court] regarding the status of the appeal in this case, but the record does not reflect that anything else was done in furtherance of the appeal.

Crawford's present appellate counsel made an entry of appearance on January 7, 2014. [Footnote 3 from the original. "On December 16, 2013, the circuit court entered an order appointing the Office of the State Public Defender, Indigent Appeals Division, to represent Crawford in this appeal. The Public Defender's Office determined that it had a conflict in this case, and therefore contracted with the undersigned counsel under the provisions of Mississippi Code Section 99–40–1(2) to represent Crawford in the appeal of this matter.] Present counsel then filed an amended and corrected notice of appeal and an amended and corrected designation of record. The case was submitted for [Supreme Court] review of the issues on March 23, 2015. *Crawford*

*v. State*, 192 So. 3d 905, 907-912 (Miss. 2016).

The Mississippi Supreme Court affirmed Crawford's conviction and sentence for rape and subsequently denied his petition to vacate his conviction and sentence. He then filed the present petition for a writ of habeas corpus, alleging thirteen separate issues. The Court will address each issue in turn.

### THE APPLICABILITY OF THE DEFERENTIAL AEDPA STANDARD SET FORTH IN 28 U.S.C. § 2254(d)

As an initial matter, the Court notes that the parties disagreed regarding the proper standard of review in this case. The Petitioner, through counsel, improperly split his grounds for relief between the petition and his traverse. The petition itself presents facts and arguments on all thirteen of his claims as if this Court would be conducting a *de novo* review, rather than under the restrictive standard set forth in the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which requires a federal court on habeas corpus review to give great deference to the state court's factual findings and legal conclusions. *See* 28 U.S.C. § 2254(d). The Petitioner initially declined to brief his grounds for relief through the lens of the AEDPA, deferring such discussion until the State relied on the AEDPA in its response. When the State did so, Mr. Crawford filed a lengthy traverse, raising numerous new arguments which addressed the State's AEDPA arguments. The State filed additional argument in the form of a surrebuttal, rather than an objection to the introduction of new arguments in the Traverse. Though this haphazard procedure diverges from the accepted path for briefing in federal habeas corpus cases, in the interest of judicial economy, the Court has reviewed all arguments on this issue, and the parties have thoroughly briefed all issues.

Crawford argues that several of the decisions by the Mississippi Supreme Court contain insufficient reasoning to constitute an adjudication on the merits (the trigger for deferential review

in the habeas corpus context under § 2254(d)). If Crawford were correct, then the Court would not be constrained in its review by the AEDPA's deferential standard. However, as the State argued, as long as the state supreme court makes a definitive ruling – even with *no* discussion – that ruling counts as an adjudication on the merits:

> Because a federal habeas court only reviews the reasonableness of the state court's ultimate decision, the AEDPA inquiry is not altered when, as in this case, state habeas relief is denied without an opinion.

*Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003).

Crawford's arguments on this point are without merit, and the Court has reviewed the relevant issues in this case under the deferential standard set forth in 28 U.S.C. § 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (emphasis added).

GROUND ONE — THE PETITIONER ARGUES THAT THE TRIAL COURT VIOLATED HIS RIGHTS WHEN IT DENIED HIS REQUEST FOR FUNDS FOR EXPERT PSYCHIATRIC ASSISTANCE TO AID WITH THE PREPARATION AND PRESENTATION OF AN INSANITY DEFENSE

There is no dispute that Crawford's first attorney, Fortier, filed a motion asking the trial court to order the state to provide funds to allow Crawford to retain Dr. L.D. Hutt, a psychologist. In *Ake v. Oklahoma,* the United States Supreme Court held that in capital cases the Fourteenth Amendment requires the government to provide an indigent defendant with the psychiatric assistance necessary to prepare an effective insanity defense. *Ake v. Oklahoma,* 470 U.S. 68, 83

(1985). Fortier selected and wanted to retain Hutt to assist Crawford in pursuing an insanity defense. Crawford *for the first time in the post-conviction proceedings* charged the trial court with violating his due process rights when it denied his request for funding to obtain the services of an independent expert to examine Crawford, assist the defense and present testimony to support his claim of insanity.

The Mississippi Supreme Court found that because Crawford's appellate attorney failed to raise the supposed denial of funds for an expert witness, he waived this argument pursuant to Section 99-39-21 of the Mississippi Code, and it was therefore procedurally barred. Section 99-39-21(1) provides:

> Failure by prisoner to raise objections, defenses, claims, questions, issues or error either in fact or law which were capable of determination at trials and/or on direct appeal, regardless of whether such are based on the laws and the constitution of the State of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.

In the present case, Crawford argues that the Supreme Court erred because this procedural bar is not strictly or regularly applied.

A federal court may not consider a habeas corpus claim when: (1) "a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement," and (2) "the state judgment rests on independent and adequate state procedural grounds." *Walker v. Martin*, 562 U.S. 307, 316, (2011) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729–730 (1991)). This doctrine is known as *procedural bar.*

A state procedural rule is "independent" when the state law ground for the decision is not "interwoven with the federal law." *Michigan v. Long*, 463 U.S. 1032, 1040, (1983). To determine the adequacy of the state procedural bar, this Court must examine whether the state's highest court "has strictly or regularly applied it." *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (citing

*Lott v. Hargett*, 80 F.3d 161, 165 (5th Cir. 1996)). The Petitioner, however, "bears the burden of showing that the state did not strictly or regularly follow a procedural bar around the time of his appeal" – and "must demonstrate that the state has failed to apply the procedural bar rule to claims identical or similar to those raised by the petitioner himself." *Id.*

Crawford contends that this procedural bar, though long found by the Fifth Circuit to be both an independent and an adequate state procedural bar, is no longer strictly and regularly applied. *Stokes*, 123 F.3d at 860. He contends the Mississippi Supreme Court has made multiple exceptions and waived the bar in a handful of cases involving fundamental rights. However, in *Stokes,* the Fifth Circuit recognized Mississippi Code § 99-39-21(1) as an independent and adequate state procedural ground that was consistently applied. Because Stokes pointed to only one case that involved the waiver of the bar and it was not a similar case, the court found Stokes failed to carry his burden to show inconsistent and irregular application of the bar. Stokes' claim, the court held, was properly denied because of the default.

This Court notes that Crawford has likewise failed to meet his burden of proof in this case. Crawford cites one case where the state court addressed the merits of a claimed *Ake* violation, despite a procedural bar. In *Pinkney v. State*, 538 So.2d 329 So. 2d 329, 343-44 (Miss. 1988), the court found that Pinkney's attorney had filed a motion for the appointment of an expert witness but failed to obtain a ruling on the motion. This would normally be procedurally barred under the waiver provisions of the Mississippi statute. The court nevertheless discussed the merits, but rather than waiving the procedural requirement to grant relief, *Pinkney* issues an alternative finding on the merits — that any *Ake* error was harmless. This Court has reviewed the other cases cited by Crawford and finds that few of them address *any* waiver of the procedural bar at issue, and none address waiver of the bar to grant relief under *Ake*. Indeed, several do not involve a waiver of the

procedural bar at all.[1]

Without showing any pertinent case where this procedural bar was waived to grant relief, the Petitioner has not shown that the state procedural bar is not regularly and strictly enforced. In accordance with the ruling in *Stokes,* therefore, the Court finds that Crawford has failed to prove the procedural bar is not consistently and regularly enforced and that it is an independent and adequate bar to Crawford's claim.

GROUND TWO — THE PETITIONER ARGUES HIS RIGHT TO EFFECTIVE ASSISTANCE WAS VIOLATED WHEN APPELLATE COUNSEL NEGLECTED TO RAISE AS ERROR ON DIRECT APPEAL THE TRIAL COURT'S VIOLATION OF PETITIONER'S RIGHT TO INDEPENDENT EXPERT ASSISTANCE

Despite the fact that Crawford's initial claim is procedurally barred, he may still prevail by demonstrating (1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law or (2) that failure to consider his claims will result in a fundamental miscarriage of justice. *See Pitts v. Anderson,* 122 F.3d 275, 279 (5th Cir. 1997). Here, Crawford attempts to demonstrate cause by arguing that his attorney's failure to object and raise the *Ake* issue on appeal constituted ineffective assistance of counsel. *See Coleman v. Thompson,* 501 U.S. 722, 753-54 (1991) ("Attorney error that constitutes ineffective assistance of counsel is cause.").

---

[1] *State v. Burkhalter*, 119 So.3d 1007, 1009 (Miss. 2013) (finding counsel was not ineffective for failing to obtain circumstantial evidence instruction in a case involving direct and circumstantial evidence -- no procedural bar was imposed in the case); *Childs v. State,* 133 So.3d 348, 351 (Miss. 2013) (discussing alleged error on direct appeal where procedural default was not an issue); *Chinn v. State*, 958 So.2d 1223, 1225 (Miss. 2007) (addressing right to present theory of defense as a fundamental right, but not involving either a procedural bar or the waiver of a bar); *Sharplin v. State*, 330 So. 2d 591 (Miss. 1976) (involving an Allen charge but not involving procedural bar and no waiver).

To establish ineffective assistance of counsel Crawford must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *See Strickland v. Washington,* 466 U.S. 668, 687 (1984). The standard of review of an attorney's performance is "highly deferential," considering only the facts and resources available to the petitioner's counsel at the time of his appeal. *Id.* at 689. When considering an ineffective assistance of counsel claim, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* When applying *Strickland* and Section 2254(d), review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). As explained in *Mitchell v. Epps* – for the district court, "[t]he pivotal question [was] whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there exists any reasonable argument that counsel satisfied *Strickland's* deferential standard. A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair minded jurists could disagree on the correctness of the state court's decision." *Mitchell v. Epps*, 641 F.3d 134, 141 (5th Cir. 2011).

In support of this argument, Crawford's appellate counsel has provided an affidavit stating that the failure to assign the trial court's denial of the *Ake* claim on direct appeal was not strategic but inadvertent. Crawford leaps from this concession of error to the conclusion that but for the error the case would have been reversed, citing multiple cases in which the Mississippi Supreme Court has reversed trial courts when they fail to abide by the dictates of the *Ake* decision. However, in this instance, the Court finds that there certainly is a reasonable argument that counsel satisfied *Strickland's* deferential standard. Indeed, it appears the state court did not in fact deny Crawford's

16

*Ake* motion, and that certainly provides sufficient rationale for the Supreme Court's decision as to this issue.

Fortier filed a motion for funds to retain psychologist L.D. Hutt. Hutt's affidavit confirmed he was given confidential information by Fortier, statements from relatives and friends and a social background. His preliminary evaluation indicated that Crawford suffered from certain disorders which could provide a basis for an insanity defense. He found that Crawford was exhibiting symptoms of Bipolar affective disorder with elements of substance dependency and suggested that Crawford might also be suffering from other "[p]erhaps even more severe, psychological disorders." (R. 10-1 p. 38).

While the trial court did not immediately grant the motion, neither did it deny the motion, and there is no order denying the motion in the file. Crawford's motion for expert witness funding was filed in April 1992, along with other pretrial motions, in both of the 1991 cases (the aggravated assault case and the rape/kidnapping case). At the hearing on April 22, 1992, Fortier told the court an insanity defense would be used in both cases. (R. 10-8 p. 7). Fortier told the court that the defense was going to deny the kidnapping charge on the facts, but defend the other two charges by claiming insanity (R. 10-8 p. 11 27). He, therefore, intended to move to consolidate these charges for trial. (R. 10-8 p. 12-13).

The prosecutor agreed that under *Ake,* if Crawford were truly an indigent defendant, he was entitled to an expert, but that the court, not the defendant, could make the selection. (R. 10-8 p. 23, 30). Crawford's grandfather testified he had paid Fortier's legal fees and that his grandson had no assets with which to repay him (R. 10-8 p. 23-26). The State then moved *ore tenus* for an examination under then Rule 4.08 of the Mississippi Uniform Rules of Circuit and County Court. They requested that Dr. Donald Guild conduct the evaluation (R. 10-8 p. 31).

17

After considering the stated expenses for retaining either the defense's choice of expert or the prosecution's preferred expert (R. 10-8 p. 31), the judge opted to get an evaluation at the local mental health facility. (R. 10-8 p. 34). The court did not believe that both the defense and the state could get examinations done in time for the cases to proceed to trial as then scheduled.

By the court:

> For the record, Miss Reporter, affidavit of Dr. Hutt Ph.D. has been filed in this case. Dr. Hutt states under oath that the defendant exhibits Bipolar Effective[sic] disorder, whatever that may mean. His report though it doesn't say it in black and white to me alludes to the fact the defendant may be suffering from some illness which effects [sic] his ability to perceive the wrongfulness of his act. The State has requested examination of the defendant under Mississippi's Rule 4.08 in anticipation of the offering of an insanity defense. I'm going to treat this case just like I have others where motions are made for psychiatric or mental evaluation, I'm going to direct that staff of the Timber Hills Mental Health Center make a report to the court, examine the defendant, administer whatever test[sic] are necessary and render their opinion to the court and to the attorneys as to the defendant's ability to know right from wrong on the date of the alleged offense. We will take it from there. By this ruling I'm in substance continuing this case but I've got real problems with Mr. Fortier's request even if he could get Dr. Hutt hired and the report comes in 10 days and the State is going to be able come in with a motion to have the defendant examined by another psychiatrist and it's not my intent by this ruling to delay this case but I don't see any other way, gentlemen. I just don't see how we can get it done in 20 days."

(R. 10-8: 34-35)

The judge told both sides "this is without prejudice to further motions from either side for examination or for funds, but I'm going to get a preliminary report and see where we are…. (R. 10-8, p 35). The judge concluded that he wanted to see this report before he decided the *Ake* motion (R. 10-8 p. 40-41).

When the trial court reconvened for motions hearings on September 14, 1992, the court learned that a Timber Hills social worker, rather than a psychiatrist or psychologist, as intended, had evaluated Crawford (R. 10-8 p. 50). Though Crawford claims in his petition that "the trial court again denied petitioner's request for an expert" the court instead found, "[w]e haven't

reached that point," an unsurprising response given the relatively benign bipolar diagnosis listed by Dr. Hutt in his affidavit (R. 10-8 p. 60). The judge wanted an evaluation done at the Mississippi State Hospital, "[t]o see whether there is a problem," and proceed after that initial evaluation to decide the *Ake* motion. *Id.* As the Petitioner has noted, Fortier objected both to the scope of the examination as contained in the prosecution's proposed order and that the evaluation would precede a defense evaluation.

Fortier then filed and argued a motion to consolidate the rape and aggravated assault charges. (R. 10-8 p. 45). He argued that trying the cases separately would create "additional financial hardships on the defendant." (R. 10-8 p. 53). The court denied the motion to consolidate after the prosecution conceded the cases were so closely interwoven that an insanity acquittal in the first trial would bar prosecution of the second under the Double Jeopardy Clause. (R. 10-8 p. 58). Fortier argued that under *Ake* "an indigent defendant was entitled to have his own expert to assist him in the defense of his case, " quoting from *Ake,* and " argued the "access to a competent psychiatrist" included "an appropriate examination and assist[ance in] and evaluation, preparation, and presentation of the defense.'" (R. 10-8 p. 60).

The court did not disagree. "Yes, sir. I understand that, and I don't think we're to that point. I think that's the thing we're all overlooking. We aren't to that point." (R. 10-8 p. 60). The court then said, "[t]he thing that bothers me about it is the case is set for trial so soon." *Id.*

After some discussion about who could perform the examination, Fortier repeated his argument that Crawford had more than just the right to be examined. Fortier admitted the defense could not demand his choice of the expert, but the expert "is supposed to be someone who is going to help him in the defense of this case, the preparation, the evaluation." (R. 10-8 p. 61). Fortier argued Crawford was entitled to an independent evaluator. ((R. 10-8 p. 62).

19

Again, the judge said the court needed to determine if he had some type of mental deficiency, "then at that point in time the court's going to have to address the issue of whether you're entitled to have an expert, your expert. We haven't reached that point." (R. 10-8 p. 62). The judge did not think the case was at the proper procedural point to rule on the motion. *Id.* "I would like for y'all to confer. I haven't heard any proof. I haven't heard anything that would indicate to me that the man has a problem." (R. 10-8 p. 62). Fortier then referenced the affidavit attached to the motion.

The judge responded, "Y'all confer; if you want to pursue this thing on insanity, I mean if you want to pursue having him examined, I'll give you an order; but I'm going to have him examined at the state hospital." (R. 10-8, p. 63). (Emphasis added).

> BY MR. FORTIER: "Then when we receive that report**,** I still have the right to come back and argue that he has a right to a psychiatrist for his defense.
>
> BY THE COURT: *That's right.*

(R. 10-8 p. 63).

There was another hearing in October because Fortier did not agree to the language in State's order for the examination. Fortier objected to the state's proposed order because it included a waiver of the medical privilege and included a competency determination (R. 10-8 p. 67-68). Fortier also objected to the production of other information and documents to be produced to the Whitfield doctors, including Dr. Hutt's report, which had not yet been completed. Hutt had seen Crawford once at that point (R. 10-8 p. 73) and was expected to see him once or twice more, before issuing a report. (R. 10-8 p. 74) Fortier objected to producing Hutt's report because he had not yet seen a report himself, and "when a defendant goes out and hires at his own expense an expert to do an evaluation, he's not required to provide this information to the state except under discovery if he's going to use the expert." The decision had not yet been reached about use of the

20

expert, per Fortier (R. 10-8 p.76). The court amended the order to eliminate the language about waiving the medical privilege (R.10-8. p 78).

By the next motions hearing, David Pannell was representing Crawford. When the court called the *Ake* motion, Pannell advised the court the motion was moot as to the aggravated assault case, where Hutt appeared and testified. Pannell told the court he was seriously considering defending both the rape and kidnapping charges on the facts and withdrawing the insanity defense completely. (R. 10-4, 39-40). Both the record and Pannell's affidavit indicate that he never renewed the motion for funds as to the rape and kidnapping charge. Because the trial court never denied the motion, the assignment of error Crawford sets out in Ground One would be without merit. Consequently, failure to raise such an assignment cannot be deficient conduct nor could it prejudice the defense.

Finally, Crawford has not provided this Court with any new evidence that, as a factual matter, would show that he did not commit the crime of conviction. Indeed, Crawford does not make that argument at all. Consequently, he has not shown a fundamental miscarriage of justice. *See Wilder v. Cockrell,* 274 F.3d 255, 262 (5th Cir. 2001).

GROUND THREE — THE PETITIONER ARGUES HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT EXPERT TESTIMONY IN SUPPORT OF THE INSANITY DEFENSE

With his next claim, Crawford argues that his trial counsel erred when he failed to discover and develop additional lay and expert testimony to support the thesis that organic brain damage and/or epilepsy rendered him legally insane. In support of this claim, he has offered excerpts of trial testimony from family members at the capital murder trial and affidavits from friends regarding Crawford's history since his childhood. For example, his father testified that Crawford was excessively afraid of the dark as a child; had been taken to a psychiatrist as a youngster because

21

of behavior problems; and placed on some type of medication. As Crawford got older, he was in a bad mood or depressed all the time and he became very rebellious at eighteen (Dkt 1 p. 341-42, 244, 346). Crawford's grandmother testified he had spells when he would get glassy-eyed and that these spells occurred in a somewhat cyclical pattern. His sister also testified on his behalf to his childhood fear of sleeping alone. She described one incident when he was "screaming and hollering" for hours because his grandparents would not let him take the car. When she was learning about psychology in nursing school, she became so concerned about him, she made an appointment for him in Memphis so he could get some help. But Crawford insisted he was better and would not go (Dkt. 1 p. 392, 395, 398. 400).

Crawford's friends' affidavits were largely devoted to trying to show that Crawford could have sustained brain damage from excessive use of drugs, multiple fist fights, and/or multiple car accidents, including one car-train collision. Other witnesses also addressed Crawford's spells and changes in his demeanor. They testified that he did not remember all the things he had done and sometimes appeared not to be himself during his spells.

However compelling Crawford's subsequently-hired expert may have found the evidence supporting his diagnosis before August 1993, there is no evidence in the record to support that a reasonably competent attorney would have recognized its supposed significance and launched a new investigation into the insanity defense in May 1993. Accordingly, the Court finds the Mississippi Supreme Court could reasonably decide that the failure to exhaustively interview all of Crawford's family and friends about his then recently-diagnosed epilepsy was not deficient conduct by counsel.

Crawford also accuses his trial counsel of failing to have a complete battery of neuropsychological testing done on Crawford after being specifically advised by Dr. Mark Webb

that such testing was imperative.  This allegation is fundamentally inaccurate.[2]

The Petitioner submitted the affidavit of Dr. Mark Webb to support the accusation that Pannell was expressly advised that a battery of neuropsychological testing was necessary.  This affidavit was dated March 24, 1994, about one month before the capital murder trial and several months *after* the conclusion of the rape trial in August 1993. Dr. Webb's affidavit provided:

> Because my evaluation of Mr. Crawford leads me to believe that he may suffer from organic brain damage, I strongly recommend that he undergo a neuropsychological battery to determine the existence and extent of any brain dysfunction.  Indeed, until such is done, it cannot be said that Mr. Crawford has had a complete psychological workup.

In a second affidavit, dated March 7, 2014, Webb reiterates the need for neuropsychological testing and that he told Crawford's attorneys they needed to have this testing done.[3]  As the state court noted in *Crawford,* 21 So.3d at 1155, n. 5, the first affidavit provides no context for why it was being given, nor does it state when counsel was advised of this asserted need for neuropsychological testing.  Given that it refers to counsel in the plural, it appears to be referencing what happened in connection with the capital murder trial, where mitigation would be a significant issue.  Without any indication in the record that this expert told Pannell before the August 1993 trial that there was a need for this testing, it does not constitute proof of counsel's neglect to make sure this testing took place.

---

[2] The Court notes that the record shows some psychological testing was done.  The Mississippi Supreme Court referenced the "battery of psychological tests" performed by Dr. Hutt, in affirming Crawford's aggravated assault claim.  *Crawford v. State*, 787 So.2d 1236, 1243).  Crawford in this case testified that Hutt performed "lots of tests" on him. (R. 10-6:37)

[3]  His affidavit also discusses his review of the testing and evaluations by Brawley, Schwartz-Watts and Nadkarni, finding it to be "extremely significant mitigating evidence," which would be germane to the capital murder trial.  Webb does not mention if these reports would demonstrate M'Naghten insanity.

GROUND FOUR — THE PETITIONER ARGUES HIS RIGHT TO EFFECTIVE ASSISTANCE WAS VIOLATED WHEN TRIAL COUNSEL FAILED TO PRESENT A COHERENT THEORY OF DEFENSE

With his fourth ground, Crawford argues his trial counsel was ineffective because he employed a "disastrous hybrid defense," asserting both an insanity defense and a fact-based defense in this case. Crawford claims that the *only* reasonable defense strategy for this case would be a pure insanity defense, using the diagnoses obtained by his new experts, though their evaluation came some twenty years after Crawford's conviction.

In his attack on Pannell's competence both in failing to discover and present the new insanity defense and instead relying on a hybrid defense, Crawford has received some assistance from his former attorney. Pannell has provided an affidavit endorsing the new theory of defense and rejecting the hybrid defense he employed at trial. The court addresses this affidavit and its impact on this court's consideration of the claims of ineffective assistance of counsel.

In pertinent part, the affidavit provides:

> I used an insanity defense in all three of Mr. Crawford's trials [the aggravated assault, rape/kidnapping case and the capital murder case]. However, in his rape case, I used a hybrid defense and argued that Mr. Crawford was insane, and also that there was insufficient evidence to prove that Mr. Crawford committed rape.
>
> I have recently reviewed the expert evaluation obtained by Mr. Crawford's post-conviction attorneys. These include an independent medical evaluation by Dr. Siddhartha Nadkarni, a neurologist; a psychiatric evaluation by Dr. Donna Schwartz-Watts; and the results of neuropsychological testing conducted by Dr. Tora Brawley, Ph.D. The information contained in their reports is precisely the type of expert testimony that I would have used to present an insanity defense in Mr. Crawford's rape trial. I believe the outcome of Mr. Crawford's rape trial would have been different had I presented this expert testimony to the jury. If I had obtained these reports prior to Mr. Crawford's trial, I would have only pursued an insanity defense, and I would not have used the hybrid defense. Additionally, had I received these expert reports prior to Mr. Crawford's trial, I believe that I would have been able to convince him not to take the stand to testify in his own defense because the insanity defense is so strong.

(R.1:715-716).

24

This affidavit does little to aid or influence the decision in this case for multiple reasons. First, Pannell may have endorsed the new insanity defense proffered by post-conviction counsel, but he by no means confesses that he has been guilty of ineffective assistance of counsel, which would confess incompetence. As will be discussed below in more detail, Pannell's enthusiasm for the new insanity defense has overlooked some fundamental flaws shown in the record. The hope that this new defense would likely lead to a different and favorable outcome is misplaced. His affidavit - executed in 2015 - twenty-two years after the trial clearly "fails to reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Reliance on "the harsh light of hindsight," even by counsel himself, is what the *Strickland* standards prohibit. *Bell v. Cone*, 535 U.S. 685,702 (2002).

Here, his affidavit so many years later indicates that time has distorted his recollection and that counsel himself may have forgotten the circumstances he faced. He clearly has overlooked the success he had at trial. His client faced two charges -- rape and kidnapping -- either of which could have resulted in a life sentence. His hybrid defense yielded an *acquittal* on the kidnapping charge. Pannell challenged the sufficiency of the evidence to convict Crawford on both the rape and the kidnapping charges. That the hybrid defense worked against one charge, even if not against both, is indicative of not only a strategic choice by counsel, but one that was at least in part successful. That a defense strategy does not "work out as well as counsel had hoped" is not proof "that counsel has been incompetent." *Harrington v. Richter,* 562 U.S. 86, 109 (2011).

Nor does the fact that an acquittal was obtained on the kidnapping charge mean that the evidence did not support the indictment. Pannell cleverly focused the jury's attention on the fact that Kelly verbally indicated she would go to Memphis with Crawford; that she had opportunities

to escape or ask for help; and that two witnesses testified that she did not appear distraught.

But other evidence fully supported the charge. Kelly testified she told Crawford she would go with him because she feared he would hurt her or her sister if she refused. Her "consent" was given shortly after Crawford had bound her with duct tape at gunpoint and dragged her through his house to rape her. As one of the prosecuting attorneys pointed out, this evidence showed she was kidnapped before ever leaving the county (R. 10-6 p. 156). Crawford told Kelly, while armed with the hammer, that he had hit her friend who had then run away. Around the time he was asking her to go to Memphis, Kelly had been begging Crawford not to hit her with the hammer. Winning an acquittal on this charge was significant; it could not have been accomplished without employing a hybrid, fact-based defense, given that Crawford admitted remembering the chain of events underlying that charge.

Furthermore, as in *Richter*, Pannell had cause to doubt his client's truthfulness, given the general implausibility of his story of on-and-off memory, his history of malingering, and the strength of the state's testimony to this effect in both cases. While not the diagnosis Crawford now advocates, Pannell had already tried one case on a pure insanity defense, only to see Crawford convicted on the aggravated assault charge and receive a twenty-year sentence.

Pannell's affidavit shows that he is second-guessing himself, and his hindsight is no more accurate nor determinative than a court's hindsight review would be. Pannell does not claim to be incompetent, and the record shows quite the opposite. Knowing now that the tactics he employed did not work, he speculates that he would have made a different decision at that time, with the Nadkarni report. But that is not the standard for this court's decision.

After an adverse verdict at trial, even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that

reflection, to magnify his own responsibility for an unfavorable outcome. *Strickland,* however, calls for an inquiry into the *objective reasonableness* of counsel's performance, not counsel's subjective state of mind. *Richter*, 562 U.S. at 109-110.

While agreeing that dissuading Crawford from testifying would be crucial to the success of any proposed trial strategy, Pannell's opinion that he could have talked Crawford out of testifying is pure speculation. Crawford foolishly ignored Pannell's advice the first time. He was clearly not a client inclined to listen to his attorney.[4] In any event, Crawford made the decision he did, and counsel's guess that a different argument would have persuaded his client to be more prudent does not entitle Crawford to a mulligan decades after the fact.

It is perfectly understandable that Pannell in the intervening years has also forgotten pertinent details about the damage Crawford inflicted on himself with his testimony. Crawford's decision hurt his cause. Where the defense is M'Naghten insanity, cogent, organized, even clever testimony from the defendant does not aid the cause, not to mention that mounting a fact-based defense on the kidnapping charge was imperative.

In the end, Pannell's affidavit is entitled to little weight or consideration precisely because it is the belated review of long-ago events. The court instead relies on what the contemporaneous record demonstrates about the actual conduct of counsel, and here it was not deficient.

---

[4] In his capital murder trial, Crawford wrote to Pannell demanding that he file motions to dismiss, to challenge the indictment and a recusal motion. Among other complaints, he chastised his attorney for failing to obtain a favorable ruling on the motion to recuse. *Crawford v. Epps,* 2008 WL 4419347, * 33.

GROUND FIVE — THE PETITIONER ARGUES HIS RIGHT TO EFFECTIVE ASSISTANCE WAS VIOLATED WHEN TRIAL COUNSEL MADE PREJUDICIAL STATEMENTS ABOUT HIM THROUGHOUT TRIAL

In Ground Five, the Petitioner accuses his trial counsel of making prejudicial statements about him throughout the trial. Crawford argues his attorney attacked him; undermined his theory of defense; urged the jury to reject his innocence and characterized his client as violent and dangerous. He accuses Pannell of introducing irrelevant and prejudicial testimony and argues that counsel's behavior at trial cannot be considered reasoned, strategic judgment.

Crawford has a catalog of complaints here, starting with a reference in opening statement to a fable of a young girl who picked up a snake. He claims this reference both blamed the victim for being raped and characterized him as an inherently dangerous. Regardless of Crawford's interpretation of the fable, Pannell immediately followed with the argument that he expected the evidence to show Kelly was infatuated with her former brother-in-law; that if Crawford felt guilty about anything it was about getting involved with his ex-wife's sister; and that there would not be scientific evidence to corroborate Kelly's claims. He said that while his client could not remember what happened, there was serious doubt about whether a crime had been committed at all. He told the jury that Crawford had a long history of mental problems, basically of being troubled and that may have made him more attractive to Kelly. (R 10-4 p. 136-38).

Crawford also complains his attorney brought up the fact that he was testifying against the advice of counsel in front of the jury. Though this is typically done outside the presence of the jury, this brief interchange does not appear prejudicial, particularly where counsel asked him why he was going to testify anyway. Crawford responded: "I feel that I need to say my part, you know to testify." (R. 10-6:31). Under the circumstances it does not seem unreasonable to try to explain why Crawford was testifying – to convince the jury that Crawford had nothing to hide. It is also

consistent with an attorney faced with an extremely difficult situation.

With the presentation of any insanity defense, prejudicial evidence is practically unavoidable. A defense of insanity opens the door, "for the admission of evidence of every act of the accused's life relevant to the issue of sanity and is admissible in evidence." *McLeod v. State*, 317 So. 2d 389, 391 (Miss. 1975). As part of Ground Five, Crawford complains that Pannell let into evidence that his mother and ex-wife were afraid of him. However, that evidence was going to come out on direct examination or cross examination. Bringing out this damaging testimony on direct rather than waiting for it to come out on cross examination is a matter of trial strategy. Crawford made a similar complaint about the introduction of unfavorable evidence in *Crawford v. Epps,* 2008 WL 4419347 at * 46, and this Court found there was no showing of entitlement to relief. *Id.*

Crawford also argues Pannell was ineffective when he told the jury they did not have to believe Jackie Brooks and may not like him. Pannell told the jury Brooks had been convicted on a marijuana charge. If Pannell thought Brooks was a bad witness, distancing the defense from him was a reasonable, strategic decision. Additionally, witnesses are subject to impeachment for their criminal convictions. In this case the prosecution left the job of Brooks' impeachment half done - raising the fact that he had some type of criminal record, but not addressing the actual conviction. A reasonable attorney could decide that telling the jury he was guilty of using marijuana was preferable to leaving the jury to speculate about the nature of his criminal history.

Looking at the whole of the trial, the Mississippi Supreme Court could reasonably find that Crawford was provided with constitutionally adequate assistance of counsel and that the prosecution's case was subjected to "meaningful adversarial testing." *United States v. Cronic,* 466 U.S. 2039, 2045 (1984). Pannell conducted meaningful cross-examinations during the State's

29

case, presented evidence in support of the defense, and conducted effective cross-examinations of the State's expert witnesses. Counsel's performance was not error free, but neither was it incompetent.

Finally, this Court notes that Crawford does not contend that the argument, comments or other errors alleged in Ground Five alone prejudiced the result. Rather, he argues again that the failure was counsel's decision not to present the new insanity defense. According to Crawford's current counsel, had Pannell investigated the Crawford's insanity defense and retained expert assistance, he would not have pursued the hybrid defense and "would have been able to convince Mr. Crawford not to take the stand to testify in his own defense because the insanity defense was so strong." Petition (Dkt 1 p. 39).

This argument acknowledges the harmful impact of Crawford testifying but fails to show that counsel was ineffective or that he could have in fact talked his client out of testifying. It is also an implicit admission that the conduct of counsel in the trial was not prejudicial. Again, the Court denies this argument as meritless.

## GROUND SIX — THE PETITIONER ARGUES HIS RIGHTS WERE VIOLATED WHEN IT TOOK MORE THAN TWENTY YEARS TO DOCKET HIS DIRECT APPEAL

In Ground Six, Crawford argues that his constitutional "rights to due process and a speedy appeal guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution were violated as result of the more than twenty-year delay in the docketing of petitioner's direct appeal of this conviction." Petition (Dkt. 1 p. 41).

In its 2015 opinion, the Mississippi Supreme noted that Crawford was convicted on the rape charge and acquitted on the kidnapping charge on August 6, 1993 and sentenced to forty-six years. *Crawford v. State,* 192 So. 3d 905, 911 (Miss. 2015). The case was submitted to the Supreme Court on March 23, 2015. The Mississippi Supreme Court noted: "The record does not

disclose why an appeal was not filed with this Court until now, which Crawford's current appellate counsel acknowledges. Counsel asserts, however, that Crawford is not to blame. We do not know that to be the case from the record before us." *Id.* at 912.

Regardless, the Mississippi Supreme Court found it had never extended - and was not required by United States Supreme Court precedent to extend - speedy trial protection to the appellate context. The Supreme Court noted that the criminal defendant has a duty to pursue his appeal from conviction. The Supreme Court proceeded to consider the appeal on the merits, because it was not certain that Crawford had "eschewed" his responsibility to pursue his appeal. Consistent with Mississippi law however, the Supreme Court held that where there is no other reversible error - that it would not reverse on the grounds of denial of the failure to have a speedy appeal. *Id*. at 912-13.

This Court finds the Petitioner has failed to prove an unreasonable application of federal constitutional precedent. *Barker v. Wingo*, 407 U.S. 514 (1972) is the controlling precedent for the right to a speedy trial but does not mandate extension of that right to appeals. Because there were no other grounds that were reversible, the denial of this claim was in keeping with Mississippi precedent and not contrary to clearly established federal law as determined by the Supreme Court of the United States.

GROUNDS SEVEN, EIGHT AND NINE — THE SECOND MENTAL EVALUATION

Grounds Seven, Eight, and Nine revolve around a second evaluation the trial judge ordered after Crawford sexually assaulted, raped and murdered Kristy Ray. After committing these new crimes, Crawford told law enforcement officers he had experienced blackouts around the time and remembered only parts of what happened. As discussed *supra,* these crimes occurred four days before trial was scheduled to commence in the present case. In Grounds Seven, Eight and Nine,

Crawford contends that the trial court violated his rights when it ordered a competency and sanity evaluation two days after this new arrest for Ray's murder. The order required a second evaluation by Dr. Lott and Dr. McMichael, which was done the next day, when Crawford would otherwise have gone to trial on the present charge of kidnapping and raping Kelly Roberts.

Crawford alleges in Ground Seven that his due process rights and his right to effective assistance of counsel were violated when the trial court allegedly forced his attorney to continue representing him at a critical stage of the proceedings. In Ground Eight, he alleges his Fifth and Sixth Amendment rights were violated when the state's experts were permitted to evaluate him and testify in rebuttal. With Ground Nine, Crawford alleges that his attorney was ineffective when he failed to object to the admission of this expert testimony.

### CIRCUMSTANCES LEADING TO THE SECOND EVALUATION

William Randy Fortier, Crawford's first attorney, had been representing him on the aggravated assault, rape and kidnapping charges. Four days before he was scheduled for trial, Crawford's family found a copy of a ransom note in the attic of the home where Crawford was staying. Afraid Crawford might be planning to kidnap someone, family members told Fortier about the note. The family and attorney alerted law enforcement, who started looking for Crawford. Unfortunately, they did not find him in time. Later that day, Kristy Ray disappeared, and a ransom note was found in her home. Crawford had broken into her family's home, attacked her, and abducted her. Sometime the next day Crawford killed Ray and on returning to his home was arrested. He waived his rights and quickly confessed that Ray was dead and led law enforcement to her body.

As with the pending rape, kidnapping, and aggravated assault charges, Crawford told law enforcement he experienced memory blackouts during these crimes. Crawford claimed he went

to an abandoned barn, which he had been stocking with food and supplies the previous month. As later proof would show, he also went to the barn with a gun, a knife, a toboggan he pulled down over his face, and handcuffs. He claimed that he blacked out after setting out for a walk and "came to himself" inside the Ray's home, to find Kristy handcuffed and crying in a bedroom. He admitted he knowingly abducted Kristy and held her overnight in the barn. He claimed he intended to release her. The next day he claimed he took off his ski mask and realized Kristy had recognized him. He then suffered another blackout. When he came out of this blackout, he found Kristy, hand-cuffed to a sapling, dead at his feet. He had stabbed her in the heart and lung.

On Monday, February 1, 1993, Fortier filed his motion to withdraw. Fortier advised the court he had a conflict of interest. He no longer believed in his client's insanity or innocence but believed that Crawford had murdered Ray in cold blood. His motion stated his feelings were so prejudiced towards Crawford that he could not capably and properly represent him. He also stated that pursuant to Rule 1.6 of the Mississippi Rules of Professional Conduct, he had cooperated with law-enforcement officers in the attempt to prevent his client from committing further crimes. Because of that cooperation, he stated that he had "a clear and distinct conflict of interest." (R. 10-1:101).

That day instead of calling his motion to withdraw for hearing, the judge met with Fortier and the district attorney in chambers. When the parties went on the record, the district attorney stated the parties had agreed to an evaluation of Crawford by Drs. McMichael and Lott at MSH. The district attorney recommended:

> In light of the recent events that I think the court is aware of and could take judicial notice of, Mr. Crawford has now been charged with capital murder of a young lady, which occurred Saturday, January 30th. The State would like to proceed as quickly as possible to trial on the aggravated assault charge as we had originally intended; however, under Rule 4.08 of the Court Rules, I think the legitimate question has arisen as to whether the defendant is presently competent to be able to assist his lawyer at such a

33

trial; therefore, I have made a motion, an oral motion, *ore tenus* under Rule 4.08 to ask the Court to have him examined as to his present competency and sanity. Mr. Fortier and I have conferred, and Mr. Fortier has agreed to join me in the motion.

(R.10-4:8-9).

Fortier responded that he consented to the motion to determine whether Crawford was competent to stand trial. "I think there is a serious question as to his ability to stand trial on these charges based on the facts that have come to light over the weekend; and, therefore, we have agreed with the motion; we have approved the order submitted to the court for the psychiatric evaluation." (R.10-4: 8-9).

After noting the prior examination, the judge found he could order the examination on his own motion under Rule 4.08 (R. 10-4 p. 9-10).

[The] Court is of the opinion that the Court does have reasonable grounds to believe that he needs to be psychiatrically examined to determine whether, or not, he is in fact, capable to stand trial, competent to stand trial.

*Id.* Crawford was not present at the hearing, nor had he been advised of the hearing before it was held. Fortier did not consult with Crawford before consenting to the examination or meet with Crawford after the hearing and before the examination (R. 1:726-28).

GROUND SEVEN – THE PETITIONER ARGUES HIS RIGHTS TO DUE PROCESS AND EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED WHEN THE TRIAL COURT ALLEGEDLY FORCED TRIAL COUNSEL TO REPRESENT HIM DESPITE WHAT HE DESCRIBES AS A CONFLICT OF INTEREST

In Ground Seven, Crawford argues that Fortier had a conflict of interest when he agreed to the order for the second examination and that he is entitled to an automatic reversal in accordance with *Holloway v. Arkansas,* 435 U.S. 475, 488 (1978). He made this same argument on direct appeal. The Mississippi Supreme Court rejected *Holloway* as the applicable standard for reviewing the claim of conflict between counsel and client. In an extended discussion, the Mississippi Supreme Court considered instead whether the "near per se" test of *Cuyler v. Sullivan,*

34

446 U.S. 335, 350 (1980) should apply in addressing the conflicts between the interests of the defendant and his attorney's interest, or if that court should apply the more lenient *Strickland* standards, as held by the Fifth Circuit in *Beets v. Scott,* 65 F.3d 1258, 1270 (5th Cir. 1995).

In *Cuyler* - a case addressing multiple representation conflict - reversal is warranted if there is an actual conflict and that the conflict of interest adversely affects his lawyer's performance. *Cuyler,* 446 U.S. at 350. Of course, with virtually no difference between the expert testimony that would have been offered with or without the February evaluation, Crawford could not hope to meet the prejudice standard set out by *Strickland.* The Mississippi court opted to leave the question open as to which standard it would apply in looking at conflicts arising from counsel's interests, and instead held that Crawford was not entitled to relief under either standard. The court explained that "Crawford was not prejudiced by the February 2 evaluation. And there is no showing whatever that the attorney's personal conflict in the matter had any adverse effect on his legal representation of his client." *Crawford,* 192 So. 3d at 920. Looking solely at whether Crawford could meet the higher *Cuyler* standard, the decision that it did not cannot be held unreasonable. As the Supreme Court noted, there was more than sufficient evidence apart from the February 2 evaluation, upon which the jury could have based its verdict. This Court agrees with the Mississippi Supreme Court that nothing in Fortier's conduct when he agreed to the second examination prejudiced his client.

GROUNDS EIGHT AND NINE – THE PETITIONER ARGUES THAT VARIOUS RIGHTS WERE VIOLATED WHEN THE STATE'S PSYCHIATRIC EXPERTS WERE PERMITTED TO EVALUATE HIM AND OFFER REBUTTAL TESTIMONY AND WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE INTRODUCTION OF THAT TESTIMONY

Addressing these issues, the Mississippi Supreme Court followed closely the findings and reasoning of this court and the Fifth Circuit on the capital murder Sixth Amendment challenges to the same court-ordered psychiatric evaluation. As a result, little need be said to convince this

Court that the Mississippi Supreme Court's decision does not represent an unreasonable application of binding federal precedent, nor an unreasonable finding of facts. The Supreme Court held that the court-ordered February evaluation did not violate Crawford's Sixth Amendment rights in this case, just as this court and the Fifth Circuit suggested in dicta, in the capital murder case.[5] Crawford was in fact represented by counsel at the time the examination was ordered, and Fortier was still acting as Crawford's counsel when he agreed to the order and signed off on it.

The Supreme Court went further and explained that even assuming the second evaluation was done in violation of the Sixth Amendment, such error was harmless. The court explained there was ample evidence to support the testimony of Dr. McMichael, without any reference to the findings in the second examination. This Court agrees. The Mississippi Supreme Court's decision that any Sixth Amendment error was harmless is a reasonable application of federal constitutional law, and there was ample evidence to support the testimony of Dr. McMichael, without any reference to the findings in the second examination.[6] Dr. McMichael's testimony was consistent

---

[5] *Crawford v. Epps*, 353 F. App'x 977, 983-84 (5th Cir. 2009) ("Fortier's approval likely satisfied any Sixth Amendment concerns in the rape and assault case."); *Crawford v. Epps*, 2008 WL 4419347, at *13 N.D. Miss. Sept. 25, 2008).

[6] Crawford suggests that the Mississippi Supreme Court erred in its harmless error analysis by applying the standard of review in *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993)*,* instead of the standard set out in *Chapman v. California,* 386 U.S. 18 (1967). Assuming *arguendo* that Crawford was functionally without counsel at this critical point in the proceedings, the determination of whether the Sixth amendment error was harmless is governed by *Chapman*. A constitutional error at the trial court level, may be deemed harmless error on direct appeal, if the error is found to be harmless "beyond a reasonable doubt. *Brecht* is the appropriate standard for determining harmless error on habeas review. Error is harmless unless it "had a substantial and injurious influence or effect" on the verdict. *Brecht,* 507 U.S. at 623.

Crawford's contention that the wrong standard was applied fails. First the state court does not appear to have applied *Brecht*, and secondly, any Sixth Amendment violation on the record before this court, meets the stringent requirements of *Chapman,* that the error is harmless beyond a reasonable doubt. The state court noted its agreement with this court's harmless error ruling

with the findings of the first examination (R. 10-1 p. 126-131). He even pointed to some of the facts brought out in the trial testimony that he thought provided further support for his diagnosis that Crawford was malingering.[7]

Pannell has provided his affidavit that he would have objected and counseled with Crawford had he been appointed first. Having stated no grounds for the objection, there is no reason to consider this statement. Nor is there a reasonable basis to think that any objection or consultation would have stopped the evaluation or changed anything except perhaps the date of the examination. With no arguable defense other than the insanity defense to either the aggravated assault or capital murder charges, it is unthinkable that Pannell would have advised him not to submit to the evaluation.

It is equally unthinkable that any objection would have stopped the court from ordering an examination, at least to determine if Crawford was competent. Trial of an incompetent defendant is a due process violation. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). And if evidence raises a bona fide doubt as to the defendant's competency, the court must *sua sponte* make inquiry into the

---

in the capital murder hearing, including this court's reference to *Brecht*. It is also true that the state court never cited *Chapman* in its own adjudication. But in its decision the Mississippi Supreme Court held: "*We are more than satisfied that the February 2 evaluation, standing alone, did not contribute to the verdict*." C*rawford (Direct App)* 192 So.3d at 916. (Emphasis added). The decision does not reflect application of the wrong standard.

Even if this court suspected that the wrong standard was applied by the Mississippi Supreme Court on direct review, given that the only substantive mention of information derived from the second evaluation came from Crawford's testimony and his counsel's cross-examination of Dr. McMichael, the undersigned finds that any error would be harmless beyond a reasonable doubt, based on all the evidence in the record. Accordingly, this argument should be rejected.

[7] McMichael questioned how Crawford could tell Barry King he was in trouble with the law and tell Memphis law enforcement they were looking for him, when he supposedly did not know he had assaulted Nicole, and Kelly, his only known victim, had been with him the entire time. (R. 10-6: 105-06).

37

competence. *Id*. at 387. Given this constitutional imperative and Crawford's statements to law enforcement about his lack of memory, there was a bona fide doubt regarding his competency. Not only did the trial judge have the authority to order an examination, he likely had no other option.

Crawford also argues that the trial court violated his Fifth Amendment rights when it allowed these experts to question him the second time. However, as the court noted, the Fifth Amendment can be waived, and there is no dispute that Crawford was specifically warned prior to the evaluation that the report generated as a result of the examination would be disclosed. He also was reminded of his right not to say anything which might incriminate him in a court of law. This Court agrees with the state court that no contention or showing has been made that Crawford was not informed or counseled as to his rights prior to the examination, and thus this argument as it relates to the Fifth Amendment fails.

In Ground Nine, Crawford argues that his constitutional rights were violated when his trial counsel failed to object to the introduction of the expert rebuttal testimony. As the respondent points out, however, this argument was not raised on direct appeal and thus will not be considered here.

## MISCELLANEOUS TRIAL ERRORS

Finally, the Court must address a collection of miscellaneous allegations of trial error. In Ground Ten, Crawford claims he was deprived of due process and a fair trial when the trial court gave a jury instruction that "improperly shifted the burden of proof" to him. In Ground Eleven, Crawford contends the trial court denied him a fair trial when it prohibited him from testifying to his theory of defense. In Ground Twelve, Crawford alleges the trial court denied him a fair trial because of prosecutorial misconduct. Finally, in Ground Thirteen, Crawford contends the trial

court violated his due process rights when it improperly granted a flight instruction to the jury.

GROUND TEN — THE PETITIONER ARGUES THE TRIAL COURT VIOLATED HIS CONSTITUTIONAL RIGHTS WHEN IT IMPROPERLY SHIFTED THE BURDEN OF PROOF TO HIM

Crawford contends the court gave a jury instruction that placed the burden of proof on the

defendant to establish his insanity. The challenged instruction provided:

> THE COURT instructs the jury that the defendant, CHARLES RAY CRAWFORD, has raised the defense of insanity in this case. The terms and concepts of "sanity" and "insanity" as used in jury instructions and in this case are legal terms and concepts and not medical terms.
>
> The legal test for insanity under the law in the state of Mississippi is referred to as the M'Naghten Rule. The M'Naghten Rule states: To establish a defense on the grounds of insanity, it must be clearly proved that at the time of committing the act for which the defendant has been indicted that the defendant was laboring under such defect of reason from disease of the mind, as to not know the nature and quality of the act the defendant was doing, or, if the defendant did know the nature and quality of the act, that the defendant did not know it was wrong.
>
> Stated more succinctly, the test for insanity is whether the defendant was able to distinguish right from wrong at the time the act was committed.
>
> The question of insanity is for the jury to determine. Furthermore, the jury is not bound by any expert's testimony and may accept or reject it in whole or in part.
>
> The Court instructs the jury that even should you find that the defendant was suffering from a mental illness, an emotional problem, or some other condition or problem which could be classified as a "disease of the mind," you may not find the defendant not guilty by reason of insanity unless you also find from all the evidence in this case that the defendant's condition left the defendant unable to distinguish right from wrong at the time the act was committed.

(Instruction S-8. R. 10-2, p. 87-88).

The trial court also specifically instructed the jury concerning the State's burden of proof

regarding Crawford's insanity defense in S-4 (R. 10-2 p. 71- 2):

> THE COURT instructs the jury that if you find that the State of Mississippi has proved beyond a reasonable doubt all the essential elements of rape as set forth in jury instruction number S-2, then you must find the defendant, Charles Ray Crawford, guilty of rape, unless the State of Mississippi has failed to prove beyond a reasonable doubt that the defendant' Charles Ray Crawford, was sane at the time the defendant committed

the rape.

In order to prove the defendant, Charles Ray Crawford, was sane at the time he committed the rape the State of Mississippi must prove beyond a reasonable doubt that at the time of commission of the rape the defendant, Charles Ray Crawford, had the mental capacity to realize and appreciate the nature and quality of his actions and to distinguish between right and wrong with reference to the actions he committed.

If after considering all of the evidence in this case you find the State of Mississippi has failed to prove beyond a reasonable doubt that the defendant was sane at the time of the commission at the rape, then your verdict under Count I of the indictment must be not guilty by reason of insanity.

(R. 10-2 p. 71-72).

This jury instruction addressed other matters to be determined in the event of an insanity acquittal. Jury Instruction S-4-A (R. 10-2 p. 73-74) was a reiteration of the S-4 instruction, save that it applied to the kidnapping charge. The court also instructed the jury on the presumption of innocence and that the defendant is not required to show his innocence. (R. 10-2 p. 89).

The Mississippi Supreme Court found the challenged jury instruction was an imperfect statement of the law but, when read with the other instructions, the jury was appropriately instructed. Errors in the charge to the jury rarely form a basis for federal habeas relief. That an instruction may be erroneous is not enough; rather there must be a constitutional error. *Gilmore v. Taylor*, 508 U.S.333, 341 (1993); *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Reading the instructions together, the jury was adequately instructed. Additionally, Pannell addressed the burden of proof in closing arguments and stressed the burden was on the state. R. 10-6 p. 147. Pannell explained when the defendant has raised a reasonable doubt about his sanity, the state must prove the defendant was sane beyond a reasonable doubt. While the district attorney doubted whether Crawford's sanity was put in doubt by the lay testimony, he argued the proof of the defendant's sanity was found both in the testimony of the experts and Crawford's behavior around the time of the crime (R. 10-6 p. 135). Accordingly, Crawford has failed to demonstrate

constitutional error as to this issue.

GROUND ELEVEN — THE PETITIONER ARGUES THE TRIAL COURT VIOLATED HIS CONSTITUTIONAL RIGHTS WHEN IT PROHIBITED HIM FROM TESTIFYING TO HIS THEORY OF DEFENSE

In a fact-based defense against the rape charge, Crawford claimed that he could not have held a gun to Kelly's head and bound her with duct tape as she had testified. (R. 10-6 p. 45-47). Crawford testified at trial that a few days before this crime, he had fallen and hurt his arm when he fell eight to ten feet and landed on his head and arm. (R. 10-6 p. 45-46). While the testimony varied about whether he had a cast or sling on his arm, the testimony was consistent that Crawford had sustained some type of arm injury. Crawford argued in this ground that the court deprived him of his right to present his theory because the trial judge sustained and refused to allow Crawford to answer a single question in the following exchange:

> Q. Is there any way physically that you could have held a gun and taped her with this cast on your hand?
>
> BY MR. LITTLE:  Object to the form of the question your honor, if he doesn't remember.
>
> BY THE COURT:  I sustain the objection.
>
> Q:  With the cast on your hand did you have the physical dexterity to use something like she described?
>
> BY MR. LITTLE:  Same objection, your honor.
>
> BY THE COURT: Sustained.

(R. 10-6 p. 47).

Given that Crawford was testifying about events that he professed he did not remember, the question was a hypothetical question to a lay witness. But even if the objection was erroneously sustained, the record clearly shows that whether Crawford could have restrained Kelly, given his injury, was presented to the jury for their consideration. Kelly herself testified that Crawford was

barely able to use his right arm when he taped her. (R. 10-5 p. 196). That she could wet the tape over her mouth and loosen it so she could speak to him during the rape showed that Crawford was not particularly effective in at least part of his taping. Additionally, Pannell cross-examined Kelly about how Crawford could have held a gun to her head and bound her with tape with his arm injury. (R. 10-5 p. 218-20).

Crawford also testified about the injury to his arm he sustained two days before the rape. He told the jury he had been taken to hospital and his arm put in a cast or sling and though badly strained, it was not broken. The jury was told the injury was to his right, dominant arm, and he told them the cast or splint severely limited the use of his right hand. Because Crawford presented this defense, supported by his testimony and the victim's testimony, the refusal to allow the answer to these two questions was not prejudicial to the presentation of this theory of defense.

GROUND TWELVE — THE PETITIONER ARGUES HIS CONSTITUTIONAL RIGHTS WERE VIOLATED BY PROSECUTORIAL MISCONDUCT

Next, Crawford complains of prosecutorial misconduct. Specifically, he alleges the prosecutor engaged in improper cross examination of defense witness, Jackie Brooks, and made improper comments about Brooks during closing argument. Brooks had driven Crawford and Kelly to Memphis after she was raped. Crawford complains that during Brooks' cross examination, (R. 10-5, p. 122-128), the prosecutor mentioned that he and Brooks were acquainted, letting the jury know that he previously prosecuted Brooks. The prosecutor also asked Brooks if he and Crawford smoked marijuana cigarettes on the way to Memphis, to which Brooks replied that he did not remember, but that he usually smoked Winston cigarettes.

He also questioned Brooks about the route taken to Memphis, suggesting that it was chosen because it was less traveled and because it went through Tennessee, not Mississippi. Brooks denied Crawford told him he was in trouble with the law, but admitted that Crawford told him he

needed to get to the Memphis and that Brooks was better off not knowing why. Brooks decided not to ask. He testified that Crawford told him he needed to borrow his truck because his was torn up, though he had to admit Crawford had driven it to his house, and Brooks did not ask him about that either. Brooks also admitted on cross examination that when he learned the next day that Crawford "had done beat a girl with a hammer," (R. 10-5, p. 124-25), he called his lawyer, not the sheriff.

In the course of the entire closing argument - including one and one-half pages addressing Brooks' testimony - Crawford complains that the prosecutor said the following about Brooks: "Folks, I have prosecuted Jackie Brooks. I don't like Jackie Brooks. He don't like me. I don't believe a word that man says. If y'all do, that's fine. That's y'all's job." (R. 10-6 p. 5).

A prosecutor should not offer personal opinions about a witness' credibility. Doing so runs the risk of giving the impression that the prosecutor's opinion is based on evidence not in the record, or that his opinion is sanctioned by the government. *United States v. Young,* 470 U.S. 1, 18-19 (1985). While a witness may be impeached with a felony conviction, the prosecutor never identified any crime of conviction so the jury could assess the impact on the witnesses' credibility.[8]

Understanding this, the Court must determine if any improper questioning or comments were harmful to the defendant and determine whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The Mississippi Supreme Court rejected this ground, and this Court is bound by that determination unless unreasonably wrong.

---

[8] In fact, this omission led to Crawford's attorney telling the jury that Brooks had a marijuana conviction.

Brooks testified about his interaction with Kelly and Crawford on the night of the crime and the fact that she did not appear to be frightened or under duress. (R. 10-5 p.119). He testified to Kelly's opportunity to escape. In the fifteen to twenty minutes it took for Crawford to talk Brooks into helping him and for Tammy Brooks to get dressed, Crawford remained inside the home and Kelly remained in Crawford's truck with the truck running, per Jackie's testimony. (R. 10-5, p. 117). He testified that it was his impression that Crawford and Kelly were girlfriend and boyfriend. (R. 10-5 p. 118, 119).

Whatever the intent of the prosecutor – and whatever criticisms might be directed at the propriety of his questions and comments – they are isolated within the context of the case and did not infect the case with unfairness. Aside from these comments, Brooks' testimony gave cause for questioning his veracity. But it appears that the jury likely credited at least some portion of his testimony, given that Crawford was acquitted on the kidnapping charge. Accordingly, there is no showing that the Mississippi court's rejection of this ground was unreasonably wrong.

GROUND THIRTEEN — THE PETITIONER ARGUES THE COURT VIOLATED HIS CONSTITUTIONAL RIGHTS WHEN IT GAVE THE JURY AN IMPROPER FLIGHT INSTRUCTION

In his final Ground, the Petitioner alleges the trial court violated his Sixth and Fourteenth Amendment rights when it gave the jury an improper flight instruction. As already noted, challenges to jury instructions rarely provide a basis for habeas corpus relief. *Gilmore v. Taylor,* 508 U.S. 333, 342 (1993); *Estelle v. McGuire,* 502 U.S. 61 (1991).

Crawford contends his trip to Memphis was explained, because both he and his victim testified they were going to see his ex-wife, Kelly's older sister. Therefore, according to Crawford, granting the flight instruction was error. The flight instruction provided:

THE COURT instructs the jury that "flight" is a circumstance from which guilty knowledge and fear may be inferred. If you believe from the evidence in this case,

44

beyond a reasonable doubt that the defendant, CHARLES RAY CRAWFORD, did flee or go into hiding, such flight or hiding is to be considered in connection with all other evidence in this case. You will determine from all of the facts whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think it is entitled to in determining your verdict in this case.[9]

The record reveals ample evidence to support granting this instruction. When Kelly asked Crawford not to hurt Nicole, Crawford went outside and repeatedly hit Kelly's friend in the back of her head with a hammer. He said, "What have I done? We've got to get out of here. Somebody is here." When they got outside, he told Kelly that he had hit Nicole and she ran away. He told Kelly he needed to go to Memphis to talk to her sister. Crawford asked Kelly to shoot him at one point, and that "I need to see Janet. I've got to see Janet. I've got to talk to her because I can't go back to jail."

He then started driving to Barry King's house, driving on the back roads heading toward Memphis. He told Kelly that he was going to ask King to borrow a vehicle because he knew the law was looking for him. He then went to Jackie Brooks' home again seeking to borrow a vehicle. Brooks agreed to give him a ride. Crawford told Brooks he could keep the truck because he probably would not be coming back because he was in "deep crap." Brooks told Crawford to park his truck behind his house so it could not be seen from the road.

In other words, there is ample evidence that Crawford left not just the scene, but the state, trying to avoid apprehension. That Crawford construes the evidence as having an innocent explanation does not change the fact that there was evidence supporting the flight instruction, and

---

[9] The respondents point out a second instruction on flight which advised the jury that "'flight' is the evading of the course of justice by voluntarily withdrawing oneself in order to avoid arrest or detention, or the institution or continuation of criminal proceedings, regardless of whether one leaves the jurisdiction." Jury Instruction S-6. (R. 10-2 p. 85).

45

thus, there is no merit to this assignment of error.

CONCLUSION

The Mississippi Supreme Court rejected twelve of Crawford's thirteen claims. For the reasons stated above, the Court finds that such decisions are neither unreasonable applications of governing United States Supreme Court precedent nor unreasonable findings of fact in view of the record. That is, all twelve of these grounds are without merit. The Court further finds that the procedural bar to Ground One prohibits this Court from considering that ground, given the failure of Crawford to show cause, prejudice, or a fundamental miscarriage of justice. Accordingly, the instant petition for a writ of habeas corpus is DENIED.

SO ORDERED, this the 29th day of September, 2020.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE